# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

KAREN CARRON,                        )
                                     )
    Plaintiff,               )
                                     )
    vs.                      )       Case No. 1:15cv49 PLC
                                     )
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
    Defendant.               )

## MEMORANDUM AND ORDER

Karen Carron ("Plaintiff") seeks review of the decision by the Social Security Commissioner, Carolyn Colvin ("Defendant"), denying her application for a period of disability and disability insurance benefits under the Social Security Act ("Act"). The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 4). The court has reviewed the parties' briefs and the entire administrative record, including the hearing transcript and the medical evidence. For the reasons set forth below, the case is reversed and remanded.

### I.        Procedural History

In August 2011, Plaintiff filed an application for a period of disability and disability insurance benefits claiming that she became disabled on May 27, 2011. (Tr. 181-87) The Social Security Administration ("SSA") denied Plaintiff's claim, and she filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 112-18, 119-21) The SSA granted Plaintiff's request for review and conducted a hearing on July 15, 2013. (Tr. 68-100, 123-24) Plaintiff, who was represented by counsel, testified at the hearing. (Tr. 68-100) In a decision

dated October 25, 2013, the ALJ found that Plaintiff had "not been under a disability within the meaning of the Social Security Act from May 27, 2011 through the date of this decision." (Tr. 12-21) Plaintiff sought review of the ALJ's decision, and the SSA Appeals Council denied her request on February 4, 2015. (Tr. 8, 1-6) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as Defendant's final decision. See 20 C.F.R. § 404.981.

## II.    *Evidence Before the ALJ*

### A.    *ALJ Hearing*

Plaintiff, who was represented by counsel, appeared at the administrative hearing in July 2013. (Tr. 68). Dr. Chukwuemka Ezike and Dr. Tyra Watts, a vocational expert, were also present. (Id.). The ALJ began by examining Plaintiff, who testified that she was forty-four years of age and had completed two years of postsecondary education in early childhood education. (Tr. 70). Plaintiff stated that, in 1989, while working as a CNA at a nursing home, she "slipped three discs" and broke her tailbone. (Tr. 71). Plaintiff subsequently received physical therapy and pain medication. (Id.)

Plaintiff "had numerous back surgeries," the most recent of which was approximately two years prior to the hearing. (Tr. 71). Plaintiff explained that the surgeries, performed by surgeon Dr. Richard Gahn, were intended to "just to kind of maintain my back, not really to make it better" and "so far I haven't had any relief." (Tr. 72). Every three months, Plaintiff visits Dr. Ghan at Advanced Pain Control and receives injections in her lower back. (Id.) Plaintiff testified that Dr. Matthew Bosner treats her for "mitral valve prolapse," and her general practitioner, Dr. Susan O'Donnell, treats her anxiety. (Tr. 73)

Plaintiff stated that she takes the following medications: hydrocodone, Ambien, Xanax, Metoprolol, and Dilantin. (Tr. 72-73). The hydrocodone, which Plaintiff takes "every four to six

hours" causes Plaintiff to feel "really foggy headed . . . kind of like you're kind of in a daze at times when you're trying to think, and you're not able to get a clear thought." (Tr. 74).

In regard to her daily routine, Plaintiff testified that she usually awakens at 5:45 a.m. to care for her five-year-old granddaughter, whom she is raising. (Tr. 75, 77). Plaintiff enjoys reading, but needs "to take breaks throughout the day." (Id.). Plaintiff also cooks, but requires many breaks, "probably four to six times a day." (Tr. 76). She enjoys boating with her family, but can no longer swim because "it just hurts" and she is unable to "get up and down the ladder."

Plaintiff stated that she was able to take care of her personal needs, such as dressing and bathing, but in "very, very little bursts at a time. I can't, can't do everything at once." (Tr. 77). Plaintiff wears a back brace and, when she is out with her husband, she holds onto his arm. (Tr. 78). Plaintiff cannot sit longer than ten to fifteen minutes before needing to stand. (Id.) Plaintiff stated that she visits both her mother and her father-in-law once a week. (Id.).

Plaintiff's attorney also examined Plaintiff. (Tr. 79). Plaintiff stated that she owned an in-home daycare until May 27, 2011. (Tr. 80). She closed the daycare because "I couldn't lift the children up onto the changing table to change them, and that's the state rules. I couldn't get down on the floor to tie their shoes, or to play games. It was just so much pain I just couldn't do it anymore . . . ." (Tr. 80-81).

Plaintiff testified that, despite a back brace, medication, injections, and breaks to lie down, she suffers lower back pain "24 hours a day" and nothing "makes the pain go away altogether." (Tr. 79) Plaintiff testified that she had undergone "[a]t least eight" surgeries on her back. (Tr. 80). The pain in her lower back "goes down my right leg and it makes my right leg feel heavy, and it's hard to stand up without having the pain go down my leg." (Id.). Her doctor's current plan is "just maintaining" her back, as he "doesn't have anything that is

available to his knowledge that would actually help me. It's just more for pain control at this point." (Id.).

Plaintiff stated that she experienced heart palpitations "[t]hree to four nights a week." (Tr. 81). As a result of her anxiety, she did not "like to be around people" and "the slightest things just set me off." (Id.) She suffered "full-blown anxiety attacks" approximately "once every three months" and felt "really" depressed two or three days a week. (Tr. 82). When she feels depressed she cries "a lot" and tries "to stay busy." (Tr. 83). She is able to read fifteen or twenty minutes at a time and has difficulty "holding the thought." (Id.). Concerns about paying the bills, raising her granddaughter, and the problems with her back, heart, and "this new lung disease" distract her.[1] (Id.)

In response to the ALJ's follow-up questions, Plaintiff stated that, for her depression and anxiety, she "talk[s] to [her] priest." (Tr. 85). Although Dr. O'Donnell recommended she attend community counseling, she had not done so because "there's not many people that can watch [my granddaughter] for me to go." (Id.)

The ALJ examined Dr. Ezike, who had listened to Plaintiff's testimony and reviewed her medical records. (Tr. 86-87). Based on his review of her records, Dr. Ezike concluded that Plaintiff suffered: asthma and sarcoidosis; hypertension; lumbar degenerative disc disease; seizure disorder; and mild coronary artery disease. Dr. Ezike assessed the following limitations:

> The Claimant should be able to lift 20 occasionally, 10 pounds frequently. She should be able to sit six hours in a day with normal breaks. She should be able to stand and/or walk about two to four hours in a day with normal breaks. Pushing and pulling would be as lifting. And as for postural limitations, occasional ramps or stairs, never climbing of ropes, ladders or scaffolds;

---

[1] Plaintiff explained that Dr. Goldstein recently biopsied her lung and diagnosed her with sarcoidosis. (Tr. 83). She would meet with him to discuss treatment later that week. (Id.)

occasional balancing, stooping, bending, crawling, squatting or kneeling; and no established visual, communicative, or manipulative limitations.

And as for environmental limitations I feel she should avoid all hazards, including height and machinery. She should avoid exposure to more than moderate concentrations of dust and other pulmonary irritants. She should also avoid extreme temperatures, especially heat and humidity.

(Tr. 87-88). In regard to mental limitations, Dr. Ezike stated: "I did come across some psychiatric impairment which I defer to because I'm not a psychiatrist." (Tr. 88)

Finally, the ALJ examined vocational expert, Dr. Tyra Watts, who testified that Plaintiff previously performed the duties of a nurse assistant and daycare center worker, which are both "semi-skilled, strength of medium." (Tr. 91-92). She did not deem any skills that Plaintiff acquired in her previous positions as transferable to light work. (Tr. 92).

The ALJ asked Dr. Watts to consider a hypothetical claimant with Plaintiff's background and the limitations identified by Dr. Ezike. (Tr. 92-93). Dr. Watts stated that such an individual would be able to perform the duties of an information clerk or router. (Tr. 93).

The ALJ then asked Dr. Watts to assume the same restrictions but a limitation to sedentary work, meaning "a maximum lift of ten pounds and a maximum stand and/or walk of about two hours in an eight-hour workday." (Tr. 94). Dr. Watts stated that such an individual would be able to perform the duties of an order clerk or rating clerk. (Id.). Dr. Watts did not believe that further limiting the hypothetical individual to simple and/or repetitive work would affect that person's ability to perform the jobs previous identified. (Id.). While an additional limitation of avoiding "close interaction with the public," would preclude work as an information clerk, order clerk, or rating clerk, such person could work as a weight tester. (Tr. 94-95). When Plaintiff's attorney asked Dr. Watts "what type of interaction within these [light and sedentary] jobs would be required from a worker with their coworkers and supervisors?," Dr. Watts answered, "The sedentary jobs would require superficial interaction with coworkers." (Tr. 97).

Dr. Watts testified that if the hypothetical individual either "consistently miss[ed] more than two days a month" or randomly and at least once per week "show[ed] up late to work, or le[ft] work early, or step[ped] away from the work setting," he or she would be terminated. (Tr. 95). Likewise, the need to alternate between sitting and standing every ten to fifteen minutes, at either the light or sedentary levels, would preclude employment in the identified positions. (Tr. 96-97).

At the end of the hearing, the ALJ requested Plaintiff provide the records from her upcoming follow-up appointment with her pulmonologist. (Tr. 98). In addition, the ALJ requested Plaintiff undergo a psychological consultative exam. (Tr. 98).

B. *Relevant Medical Records*

The earliest evidence of Plaintiff's chronic back pain appears in Dr. Ghan's report from an April 8, 2009 visit for "pain across the low back especially on the right side radiating into the lower extremity towards the foot." (Tr. 331). Dr. Gahn noted that Plaintiff was taking Vicodin and ibuprofen, but the pain "has been persisting and increasing over the last six months" and Plaintiff's "chronic disabling pain . . . has caused psychological, social, and physical impairment." (Id.). Dr. Ghan noted the following diagnoses: sacroiliitis, not elsewhere classified; lumbar disc displacement/herniation; lumbosacral spondylosis without myelopathy; enthesopathy of hip region; myalgia and myositis, unspecified; nerve root compression, lumbar; and unspecified nerve root and plexus disorder. (Tr. 332). Dr. Gahn administered bilateral sacroiliac joint injections. (Id.) Plaintiff returned to Dr. Ghan's office on June 2, 2009 and received bilateral sacroiliac joint injections. (Tr. 333).

Plaintiff visited her primary care physician, Dr. Susan O'Donnell, for a physical examination on August 3, 2009. (Tr. 294-96). At the physical, Plaintiff complained of "having

palpitations more frequently," "taking more Xanax than she is prescribed," depression, and pain in her right shoulder. (Tr. 294). Dr. O'Donnell noted that Plaintiff's "[l]ife is pretty stressful," and sent her to the emergency room. (Tr. 296, 316). A chest x-ray on August 19, 2009, showed "peribronchial thickening" and "slight increased density in the left base," and a CT scan of Plaintiff's abdomen and pelvis on August 21, 2009 revealed some abnormalities. (Tr. 313, 315). On August 22, 2009, doctors at Ste. Genevieve County Memorial Hospital diagnosed Plaintiff with E coli sepsis. (Tr. 304-07). At a follow-up appointment with Dr. O'Donnell on September 17, 2009, Dr. O'Donnell noted that Plaintiff had been hospitalized for E coli sepsis and reported continued fatigue. (Tr. 291-93).

Dr. Bassan Roukoz at Metro Heart Group examined Plaintiff on September 13, 2010. (Tr. 323). Dr. Roukoz noted that Plaintiff "continues to experience chest heaviness sometimes at rest and sometimes with exertion" and "heaviness and tightness substernally radiating to both shoulders." (Tr. 323). Dr. Roukoz increased Plaintiff's aspirin dosage and recommended a left heart catheterization, which he performed on September 23, 2010. (Tr. 321, 435).

On September 16, 2009, Plaintiff returned to Dr. Ghan's office because she was experiencing "severe low back pain occasionally radiating into the right hip and right lower extremity." (Tr. 335). She described her pain as an eight on a scale of one to ten. (Tr. 336). Dr. Ghan noted that Plaintiff "appears to have lumbar facet joint pain as well as sacroiliitis," and he administered four lumbar facet joint injections. (Tr. 335).

At her next visit with Dr. Ghan on March 2, 2010, Plaintiff reported that "she was doing better following lumbar facet joint injections until the last month or so" when she "developed increasing low back pain especially in the right side intermittently radiating into the right lower

extremity towards the foot and ankle." (Tr. 337). Plaintiff was taking Vicodin and Flexeril, and Dr. Ghan administered a right sacroiliac joint injection. (Id.).

When Plaintiff returned to Dr. Ghan on July 13, 2010, she informed him that she "did not have much improvement following her injections in March" and her back pain "is interfering with her activity." (Tr. 339). Dr. Ghan concluded that Plaintiff had "continued sacroiliitis as well as myofascial pain" and administered a right sacroiliac joint injection. (Id.). Because Plaintiff's pain was "unchanged" after the July 13 procedure, Dr. Ghan administered bilateral sacroiliac joint injections on July 26, 2010. (Tr. 342). An MRI of Plaintiff's lumbar spine on July 26, 2010 revealed: degenerative disc signal changes at T11-12 and L5-S1; minimal disc bulge at L4-5; bilateral L4-5 degenerative facet joint changes; and a right paracentral tiny disc protrusion at L5-S1. (Tr. 357-58).

At an appointment with Dr. O'Donnell on April 16, 2010, Plaintiff requested more Xanax and "something for depression" because Cymbalta was "not working as well." (Tr. 288). At a medication check-up on September 20, 2010, Dr. O'Donnell switched Plaintiff's medications from Cymbalta to Pristiq. (Tr. 285). In a follow-up visit with Dr. O'Donnell on October 7, 2010, Plaintiff reported that her depression and anxiety had improved with the Pristiq. (Tr. 281). Plaintiff returned to Dr. O'Donnell's office on October 11, 2010, complaining of headache, fatigue, and body ache, and Dr. O'Donnell treated her for a sinus infection. (Tr. 277-78). Plaintiff reported that "[s]he had been doing very nicely on Pristiq" and "was actually pretty happy with herself." (Tr. 277).

On November 3, 2010, Plaintiff visited Dr. Ghan complaining of "continuing right low back pain radiating into the right lower extremity" and "occasional numbness involving the right toes." (Tr. 344). Plaintiff reported that she was taking Vicodin and ibuprofen, and, after

receiving injections in July 2010, "she did not have much change in her symptoms." (Id.). Dr. Ghan found that Plaintiff had a "right-sided disc protrusion at L4-5 and is currently having radicular pain." (Id.) Dr. Ghan gave Plaintiff a transforaminal lumbar epidural steroid injection at right L5-S1. (Id.).

When Plaintiff returned to Dr. Ghan's office on February 16, 2011, she informed him that she "had a very short term transient improvement in her right lower extremity symptoms" after the November 2010 steroid injection. (Tr. 346). Plaintiff stated that her "back pain is constant, but especially worsened with activity and climbing stairs," and she was experiencing "intermittent tingling involving the right arm and hand." (Id.). Dr. Ghan administered bilateral sacroiliac joint injections. (Id.) An MRI revealed "[p]artially fused C5-C6 vertebral bodies and degenerative changes . . . at C6-C7." (Tr. 359).

Plaintiff visited Dr. Ghan again on May 6, 2011 and received another transforaminal lumbar epidural steroid injection. (Tr. 353). On June 3, 2011, Plaintiff continued "with right lower extremity symptoms as well as right-sided low back pain," and Dr. Ghan gave her a third transforaminal lumbar epidural steroid injection. (Tr. 353). Because Plaintiff's lower extremity symptoms persisted, Dr. Ghan performed a right far lateral disc compression at L5-S1 on June 23, 2011. (Tr. 360-61).

On June 20, 2011, Plaintiff visited Dr. O'Donnell because she was experiencing slurred speech and "left facial drooping." (Tr. 267, 269). Plaintiff also complained of shortness of breath and back pain. (Tr. 267) Dr. O'Donnell ordered an MRI of Plaintiff's head, carotid dopplers, and an echocardiogram. (Tr. 269). Plaintiff followed up with Dr. Roukoz on June 28, 2011 and reported "occasional left-sided weakness and memory problems." (Tr. 325).

In a follow-up visit with Dr. Ghan on August 3, 2011, Plaintiff reported improvement after the far lateral disc compression, but noted "persisting pain in the low back especially on the right." (Tr. 355). Plaintiff was taking hydrocodone, Motrin, and Flexeril. (Id.). Dr. Ghan recommended Plaintiff continue her current medications and physical therapy regimen at home. (Id.).

Plaintiff suffered two seizures on September 11, 2011. (Tr. 373-417). Her son drove her to the hospital, where she stayed for observation until her release on September 13, 2011. (Id.). When Plaintiff followed up with Dr. O'Donnell on September 20, 2011, Plaintiff stated that "her husband noticed that her speech is slurred, she feels her speech is fine" and "her back hurts like normal." (Tr. 365-67). Dr. O'Donnell noted that Plaintiff "had a TIA recently" and a grand mal seizure, but she "feels fine" and "seems very bright and sparkly." (Tr. 367).

At the request of the SSA, Dr. Gretchen Brandhorst completed a Psychiatric Review Technique for Plaintiff on October 4, 2011. (Tr. 421-31). Dr. Brandhorst found that Plaintiff suffered anxiety, but this impairment was "not severe." (Id.). According to Dr. Brandhorst, Plaintiff had no functional limitations, and she opined that Plaintiff's "impairment is adequately controlled with medication and she has few i[f] any restrictions at this time." (Tr. 429, 431).

Plaintiff visited Dr. Ghan on October 21, 2011, "complaining of continuing low back pain especially on the right referring into the right buttock and intermittently involving the right lower extremity." (Tr. 458). Dr. Ghan noted that Plaintiff was taking Vicodin and ibuprofen for her back pain, as well as Keppra for her recently diagnosed seizure disorder. (Id.). Dr. Ghan administered two sacroiliac joint injections. (Tr. 459).

Sheila Beggs, a medical consultant for the SSA, reviewed Plaintiff's Social Security disability file on November 30, 2011 and completed a Physical Residual Functional Capacity

Assessment form, listing "DDD of lumbar spine" as Claimant's primary diagnosis. (Tr. 101-06). Ms. Beggs found that Plaintiff could: occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk about six hours per eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 102). With respect to postural limitations, Ms. Beggs found that Plaintiff: could never climb ladders; occasionally climb ramps or stairs; and occasionally kneel, crouch, and crawl. (Tr. 103). She also found that Plaintiff was limited in her ability to reach in all directions. (Tr. 103-04). According to Ms. Beggs, Plaintiff needed to avoid concentrated exposure to vibration and hazards, such as machinery and heights. (Tr. 104). She found that Plaintiff's statements were only "partially credible." (Tr. 105).

On December 22, 2011, Plaintiff saw Dr. O'Donnell in regard to coughing, vomiting, tightness in her chest, and depression. (Tr. 568-71). Plaintiff returned on December 24, 2011 because she was experiencing shortness of breath, and Dr. O'Donnell ordered a chest x-ray, which showed bilateral pulmonary infiltrates. (Tr. 484). Plaintiff followed up with Dr. O'Donnell on December 30, 2011 and reported body aches and cold-like symptoms. (Tr. 566). Dr. O'Donnell opined that Plaintiff might have mycoplasma pneumonia, and she increased Plaintiff's Keppra dosage and prescribed a Z-Pak and a Medrol Dose Pack. (Id.).

At a check-up appointment with Dr. Roukoz on December 29, 2011, Plaintiff reported "occasional chest pain relieved with nitro," "shortness of breath when descending and ascending the stairs but not every time," and "edema upon awakening." (Tr. 439). Dr. Roukoz prescribed aspirin, Cardizem, hydrochlorothiazide, Metoprolol, and nitroglycerin translingual spray. (Id.).

On March 19, 2012, Plaintiff visited Dr. John McGarry, a neurologist, to discuss her history of seizures and strokes. (Tr. 532-34). Dr. McGarry directed Plaintiff to cease driving "until 6 months seizure free, and released by an MD" and take the following medications:

Metoprolol, Celexa, Keppra, ibuprofen, Xanax, Tylenol, Flexeril, ranitidine, and zolpidem.  (Tr. 534).

On April 17, 2012, Dr. Ghan treated Plaintiff for "problems with persisting sacroiliitis as well as a right L5-S1 lumbar radiculopathy."  (Tr. 455-56).  He noted that Plaintiff was taking Vicodin, ibuprofen, and Flexeril for back pain, administered two sacroiliac joint injections, and ordered an MRI.  (Id.).  On May 7, 2012, Dr. Ghan and Plaintiff reviewed the MRI's, which revealed "degenerative disc changes with a bulging disc at L5-S1."  (Id.).  Dr. Ghan also administered two bilateral sacroiliac joint injections.  (Tr. 453-54).

Plaintiff visited Dr. O'Donnell on May 3, 2012 to discuss her continued depression.  (Tr. 560-63).  Dr. O'Donnell observed that Plaintiff was "extremely anxious" and "burst into tears in the room."  (Tr. 562).  Because Plaintiff "has been bumped around a bit with Community Counseling," Dr. O'Donnell arranged for her to see Vicki Bruckerhoff, LCSW later that day.  (Id.)  Ms. Bruckerhoff found Plaintiff to be "pleasant and cooperative" but "very tearful through the entire session."  (Tr. 509).  Ms. Bruckerhoff noted that Plaintiff was "feeling overwhelmed by everything," "reported difficulty getting out of bed, loss of interest in most things," "is not [in] a good marriage," and "complains of being in constant pain."  (Id.).  Ms. Bruckerhoff administered the Beck Depression Scale, on which Plaintiff "scored in the severe category," and she determined that Plaintiff suffered: posttraumatic stress disorder; severe, recurrent depressive disorder; and generalized anxiety disorder.  (Tr. 510).  Ms. Bruckerhoff recommended Plaintiff see a psychiatrist.  (Id.).

Plaintiff returned to Ms. Bruckerhoff's office on May 10, 2012.   (Tr. 498).  Plaintiff was "tearful off and on throughout the session," and she informed Ms. Bruckerhoff that she "does not feel that the medication is helping her and therefore would be interested in a medication

evaluation with a [p]sychiatrist." (Id.)  Ms. Bruckerhoff noted that her office staff would assist Plaintiff in scheduling a psychiatric appointment.  (Id.).  Plaintiff saw Ms. Bruckerhoff again on July 23, 2012.  (Tr. 187).

On the morning of June 26, 2012, Plaintiff awoke with severe back pain.  (Tr. 469-82).  On her way to the hospital, Plaintiff rear-ended another vehicle, exacerbating her lower back pain.  (Id.)  After the accident, Plaintiff continued to the hospital where she received pain medications and instructions to continue Vicodin at home.  (Id.).  An x-ray revealed minimal thoracolumbar spondylosis.  (Tr. 482).  On July 9, 2012, Plaintiff followed up with Dr. McGarry, who directed Plaintiff to cease driving for six months, continue her current medications, obtain an EEG, and follow up in three months.  (Tr. 528-30).  On July 10, 2012 and July 24, 2012, Dr. Ghan administered sacroiliac joint rhizolysis injections.  (Tr. 448, 250).

Plaintiff had a medication follow-up appointment with Dr. O'Donnell on September 7, 2012.  (Tr. 556-59).  Dr. O'Donnell noted that Plaintiff was "in a difficult situation" because, among other reasons, her "husband has been throwing away her medicines.  He even threw away her Kep[p]ra . . . . he threw away her Ambien and her Xanax."  (Tr. 558).  Dr. O'Donnell prescribed trazodone and encouraged Plaintiff to see a psychiatrist.  (Tr. 558-59).

During an appointment on September 18, 2012, Plaintiff informed Dr. Ghan that, despite "some improvement in her low back symptoms," she was experiencing "continuing pain especially involving the right lower back area."  (Tr. 446).  Dr. Ghan administered two trigger point injections.  (Id.).  Dr. Ghan administered three more trigger point injections on December 14, 2012.  (Tr. 444).

Dr. Roukoz examined Plaintiff on October 22, 2012 because she was "complaining of increasing episodes of chest pain, described as tightness, substernal, relieved by nitroglycerin,

associated with dyspnea and occasional edema." (Tr. 438). Plaintiff stated she was taking nitroglycerin, Metoprolol, hydrochlorothiazide, and aspirin. (Id.) Dr. Roukoz recommended Plaintiff increase aspirin and continue nitroglycerin as needed. (Id.). On November 8, 2012, Dr. Roukoz administered a stress test, which revealed minimal generalized symptoms. (Tr. 435).

Plaintiff visited Dr. O'Donnell on December 10, 2012 because she was suffering "right sided chest pain, fever, cough which is hard and hacking, sore throat," and "shortness of breath." (Tr. 554). Dr. O'Donnell prescribed a Z-Pack and Prednisone and ordered a chest-ray, which revealed recurrent, bilateral, perihilar interstitial infiltrates. (Tr. 468, 554). In a follow-up appointment with Dr. O'Donnell on December 14, 2012, Dr. O'Donnell concluded Plaintiff had "a mycoplasma pneumonia." (Tr. 548-50).

On April 2, 2013, Plaintiff returned to Dr. Ghan's office "reporting increasing pain involving the low back with intermittent right radicular leg pain." (Tr. 442). Dr. Ghan administered two sacroiliac joint injections. (Id.).

Two days later, on April 4, 2013, Plaintiff visited Dr. O'Donnell complaining of high blood pressure, elevated heart rate, and headaches. (Tr. 543-47). Dr. O'Donnell tested Plaintiff's thyroid and ordered a repeated chest x-ray, which revealed persistent, bilateral perihilar infiltrates. (Tr. 467, 545). Dr. O'Donnell expressed concern that Plaintiff "may have sarcoid in her lungs and even in her heart." (Tr. 545). That day, Plaintiff underwent chest x-rays, which showed persistent bilateral perihilar interstitial infiltrates. (Tr. 594-97). A CT image of Plaintiff's chest performed on April 16, 2013 revealed reticular nodular infiltrates, a small hiatal hernia, and mild degenerative changes in the thoracic spine (Tr. 462-63, 591-92), and an echocardiogram performed on the same date revealed "[e]jection fraction . . . estimated at 76%"

and mild abnormalities. (Tr. 464-65). In a cardiac heart monitors report dated April 23, 2013, Dr. Bosner noted sinus tachycardia. (Tr. 466).

Plaintiff visited Dr. McGarry on April 15, 2013. (Tr. 524-26). Dr. McGarry assessed seizure disorder, headache, and dysarthria, and he directed Plaintiff to continue taking Dilantin, Xanax, and hydrochlorothiazide. (Id.). On May 14, 2013, Plaintiff saw Dr. O'Donnell and requested a refill of Xanax. (Tr. 539-42).

On May 17, 2013, Dr. Gary Goldstein, a pulmonologist, found that Plaintiff had a "history of a possible positive PPD versus reaction to the antigen" and "pulmonary infiltrates with a history of adenopathy." (Tr. 586-87). Dr. Goldstein recommended Plaintiff undergo an EBUS bronchoscopy, which Dr. William Zweig performed on June 4, 2013. (Tr. 587, 573-77). Based on that biopsy, Dr. William Zweig determined Plaintiff had non-caseating granulomas with associated fibrosis. (Tr. 577). After a follow-up appointment on July 26, 2013, Dr. Goldstein concluded: "Because of the increasing symptoms of cough, as well as the increasing findings of pulmonary infiltrates, I have recommended a trial of steroids starting at 40 mg daily." (Tr. 602).

On August 13, 2013, Dr. Thomas Spencer conducted the consultative examination and psychological evaluation requested by the ALJ. (Tr. 604-10). According to the psychological evaluation, Dr. Spencer found that Plaintiff "presented as dysphoric and cried off and on." (Tr. 609). In his conclusion, Dr. Spencer wrote:

> [Plaintiff] said her health concerns are exacerbated by the depression and anxiety, but she said she experienced depression and anxiety even before the onset of her health issues. In speaking with her, she endorsed symptoms consistent with major depression and generalized anxiety disorders. She sees a primary care physician. She was seeing a psychologist, but her husband reportedly dislikes the idea of psychiatric care. She said he poured out her medication in the past. She now sees a priest. [Plaintiff] denied a history of drug or alcohol abuse.

(Tr. 610).

Dr. Spencer also completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," in which he stated that Plaintiff's impairment affected her ability to understand, remember, and carry out instructions.  (Tr. 604).  More specifically, he found that Plaintiff's impairment:  markedly affected her ability to understand, remember, and carry out complex instructions; markedly affected her ability to  make judgments on complex work-related decisions; moderately affected her ability to make judgments on simple work-related decisions; and mildly affected her ability to understand, remember, and carry out simple instructions.  (Id.).  In regard to Plaintiff's ability to interact appropriately with others, Dr. Spencer concluded that Plaintiff's impairment:  moderately affected her ability to respond appropriately to usual work situations and to changes in a routine work setting; moderately affected her ability to interact appropriately with supervisors and co-workers; and mildly affected her ability to interact appropriately with the public.  (Tr. 605).

### III.     Standard for Determining Disability under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. § 404.1505(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities; or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

## IV.    The ALJ's Determination

The ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520 and found that: Plaintiff had not engaged in substantial gainful activity since May 27, 2011, the alleged onset date of disability; has the severe impairments of asthma, sarcoidosis, hypertension, lumbar degenerative disc disease, seizure disorder, major depressive disorder, and generalized anxiety disorder; and does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (the "paragraph B criteria"). (Tr. 14).

In regard to mental limitations, the ALJ found that Plaintiff had: moderate difficulties with concentration, persistence, or pace; mild restrictions in daily activities; and mild difficulties in social functioning. (Tr. 15). The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations:

> [L[ift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and walk 2-4 hours out of 8 hours with normal breaks, and sit 6 out of 8 hours with normal breaks. The claimant should avoid frequent operation of foot and hand controls. She can occasionally climb, stoop, kneel, crouch, and crawl. She cannot climb ladders, ramps, or scaffolds. She can use the upper extremity for frequent overhead use. She must avoid concentrated exposure to extreme cold, heat, wetness and humidity. She must avoid work that would expose her to whole body vibration and noxious fumes, odors, dusts and gases. She must

> avoid work at unprotected dangerous heights and machinery. Additionally, she will be limited to simple and/or repetitive tasks with no close interaction with the public.

(Tr. 17).

The ALJ found that Plaintiff's subjective complaints were not entirely credible, explaining: "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible . . . ." (Tr. 17). The ALJ found that Plaintiff's "medical treatment is not consistent with the disability allegation" of severe back pain and stated:

> Although she indicated that her back pain continued to worsen over the years, and she had numerous surgeries and injections, the medical evidence does not support these allegations. The evidence is minimal which suggests that she has not experienced frequent and persistent back pain severe enough to prevent her from maintaining regular work attendance. In addition, the claimant did not seek medical treatment for back pain at the time of her alleged disability onset date.

(Id.). The ALJ proceeded to summarize the evidence of Plaintiff's treatment by Dr. Ghan, as well as her history of seizures, palpitations, hypertension, asthma, and sarcoidosis. (Tr.17-19).

The ALJ noted Plaintiff's "long history of depression and anxiety" and treatment by Dr. O'Donnell for depressive symptoms, but discredited her testimony as to their severity, stating: "there is no evidence that the claimant established care with a psychiatrist or psychologist. The claimant has indicated that her depression and anxiety comes and goes, depending on what is going on in her life." (Tr. 18). The ALJ also cited Dr. Spencer's psychological evaluation, which stated that Plaintiff suffered "major depression and generalized anxiety" but did not address whether these conditions "preclude her from basic work activities." (Id.).

The ALJ found "[i]t is unclear why [Plaintiff] stopped working in 2008"[2] and that her "allegations of limited daily activities appear restricted mainly as a matter of choice, rather than any apparent medical proscription." (Tr. 19). The ALJ explained:

> [Plaintiff] is able to essentially live and function independently. She even provides care for a minor grandchild. There is no documented serious deterioration in [Plaintiff's] personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns over any extended period. The allegations that her impairments, either singly or in combination, produce symptoms and limitations of a severity to prevent all sustained work activity is not credible.

(Tr. 19-20). The ALJ concluded that Plaintiff's depression and anxiety "are essentially controlled by medications" and "do not limit [her] beyond a need to perform simple and/or repetitive tasks not requiring more than occasional superficial interaction with coworkers, supervisors, and the general public." (Tr. 20).

The ALJ next determined that Plaintiff "is unable to perform any relevant past work" but "there are jobs that exist in significant numbers in the national economy that claimant can perform." (Tr. 20). The ALJ relied on the vocational expert's testimony to find that Plaintiff could work as a router or weight tester. (Tr. 21). Thus, the ALJ concluded that Plaintiff had not been under a disability from May 27, 2011 through the date of the decision. (Id.).

## V.    Standard for Judicial Review

The court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quotation omitted). In determining whether the evidence is

---

[2] Although Plaintiff testified that she stopped working on May 27, 2011, her earning statements reflect that she last earned income in 2008. (Tr. 80, 188-89).

substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairments. Stewart v. Sec. of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

## *VI.  Discussion*

Plaintiff claims the ALJ erred in evaluating her mental impairments when determining her RFC. More specifically, Plaintiff contends that the ALJ improperly assessed her credibility and "created a mental RFC that conflicted with his own narrative discussion and with the only other evidence addressing mental work-related functional limitations from the consultative examiner." Defendant concedes that the ALJ erred in stating that Plaintiff presented minimal evidence of back pain, but contends that: (1) numerous other factors supported the ALJ's credibility determination; and (2) the ALJ properly incorporated Plaintiff's functional limitations and considered the medical opinion evidence when determining Plaintiff's mental RFC.

A claimant's RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a). See also Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's RFC." Masterson, 363 F.3d at737. "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation omitted). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination, and the ALJ "should obtain medical evidence that addresses the claimant's ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (internal quotation omitted).

Before determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Persall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001)). In so doing, the ALJ considers all evidence relating to the claimant's subjective complaints, including: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ may also consider the absence of objective medical evidence to support the complaints, but may not rely solely upon this factor to discredit the claimant. See Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (citing Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010)).

While "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, [and] not the courts, . . . such assessments must be based upon substantial evidence."

Masterson, 363 F.3d at 738. "The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints." Id. "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." Id. "When a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Id. at 738-39.

In this case, the credibility analysis was particularly central to the RFC determination because Plaintiff's primary complaint was chronic back pain. See, e.g., Barton v. Astrue, 549 F.Supp.2d 1106, 1120-22 (E.D. Mo. 2008). The ALJ determined that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (Tr. 17). To discredit Plaintiff's subjective complaints, the ALJ identified what he considered to be inconsistencies in the record. (Tr. 17-20). Based on this court's review of the record, it does not appear that the ALJ considered all of the evidence relevant to Plaintiff's complaints, nor does the evidence he cited "so contradict[] the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson, 363 F.3d at 739.

Plaintiff alleges that the ALJ erred in finding that her allegations of severe back pain were inconsistent with the medical treatment she received. (Tr. 17). The ALJ reasoned: "Although she indicated her back pain continued to worsen over the years, and she had numerous surgeries and injections, the medical evidence does not support these allegations. The evidence

is minimal[,] which suggests that she has not experienced frequent and persistent back pain severe enough to prevent her from maintaining regular work attendance." (Tr. 17). However, the ALJ cited considerable evidence of treatment, including: Plaintiff's regular appointments with Dr. Ghan from April 2009 through April 2013; a "series of steroid injections"; a disc decompression on June 23, 2011; seven trigger point injections between October 2011 and April 2013; and a lumbar spine x-ray on June 26, 2012, which showed minimal thoracolumbar spondylosis. (Tr. 17-18.). The quantity of evidence appears to support, rather than undermine, Plaintiff's claim of severe back pain.

Defendant concedes that "the ALJ's statement that the medical evidence was minimal . . . is inconsistent with Plaintiff's treatment history, which the ALJ summarized later in his opinion." The court agrees. A review of the record reveals sixteen dates between September 2009 and April 2013 on which Plaintiff received either facet joint injections, trigger point injections, epidural steroid injections, or sacroiliac joint injections. Dr. Ghan's records show that these injections provided Plaintiff only "transient" relief from her chronic back pain. At the hearing, Plaintiff testified that she underwent "at least eight" surgeries on her back and "[e]very three months[,] I go in and I have injections into my, both sides of my lower back." (Tr. 72, 80). Plaintiff also takes, and has taken since before the alleged date of onset, several strong prescription pain medicines, none of which seem to have provided full relief. In addition, Plaintiff's medical records show that she discussed her "numerous back surgeries" and "constant pain" with Ms. Bruckerhoff in May 2012. The ALJ's mischaracterization of the medical

evidence in this case undermines his ultimate finding that Plaintiff's subjective complaints were not credible.[3]  See Baumgarten v. Chater, 75 F.3d 366, 368 (8th Cir. 1996).

Plaintiff also claims the ALJ erred in finding that Plaintiff was "not entirely credible" because she "did not seek medical treatment for back pain at the time of her alleged disability onset date." (Tr. 17).  Plaintiff's alleged disability onset date of May 27, 2011 was the day on which Plaintiff closed her home daycare business due to her impairments, not the date of a specific injury or accident.  Furthermore, while no medical records correspond to the exact date of onset, the record reveals that the frequency of Plaintiff's appointments with Dr. Ghan was higher than usual in May and June 2011, as Plaintiff received lumbar epidural steroid injections on May 6, 2011 and June 3, 2011, and she underwent a right far lateral disc decompression on June 23, 2011.  Plaintiff's failure to seek treatment on or around May 27, 2011 does not contradict her subjective complaints.

Defendant contends that, even though the ALJ erred in finding that medical evidence of Plaintiff's back pain was minimal, the "ALJ noted a number of other factors in his credibility analysis."  Specifically, Defendant points to the ALJ's finding that Plaintiff's daily activities were inconsistent with her subjective complaints and therefore detracted from her credibility. The ALJ found that Plaintiff:  regularly arose early most days; showered; cared for her granddaughter; "essentially live[d] and function[ed] independently"; "does some cooking"; and "visits her father-in-law and her mother once a week."   (Tr. 17).  Based on this evidence, he

---

[3] The ALJ also found it significant that "[e]xcept as noted, the claimant has not been hospitalized or referred for surgery or therapy during the period relevant to this decision." (Tr. 19).  As previously discussed, however, the ALJ noted numerous surgeries and treatments including:  "a series of steroid injections" in 2011; disc decompression; seven trigger point injections between October 2011 and April 2013; a cardiac catheterization in September 2010; hospitalization subsequent to seizures in September 2011; and an EBUS bronchoscopy in June 2013.  (Tr. 16-19).

determined that "[t]he allegations that her impairments, either singly or in combination, produce symptoms and limitations of a severity to prevent all sustained work activity is not credible." (Tr. 20).

Plaintiff's daily activities, including maintaining her personal hygiene and caring for her granddaughter, do not demonstrate that her testimony describing her subjective complaints was untruthful. "A claimant need not be bedridden to qualify for disability benefits." Burnside v. Apfel, 223 F.3d 840, 845 (8th Cir. 2000) (mowing lawn, tinkering on old cars, woodworking, feeding children's pets, occasional cooking, driving, running errands, and grocery shopping does not demonstrate claimant able to return to work). See also Ross v. Apfel, 218 F.3d 844, 849 (8th Cir.2000) (ability to perform sporadic light activities does not mean that the claimant is able to perform full-time, competitive work). Furthermore, the ALJ did not discuss Plaintiff's testimony that she held her husband's arm when they left the house and she could not: sit longer than five to ten minutes, comfortably lift more than five pounds, reach for groceries, or push the cart at the store. Although the ALJ need not discuss every piece of evidence in the record, Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998), his failure to discuss Plaintiff's perception of her physical limitations leaves the court unable to determine whether the ALJ considered it and discounted it or simply failed to consider it.

Defendant also cites as evidence supporting the adverse credibility determination the discrepancy between Plaintiff's earning statements, which reflect that she stopped working in 2008, and her testimony that she owned a home daycare business until 2011. However, it does not appear that Plaintiff's apparent failure to report her earnings factored into the ALJ's credibility assessment as the ALJ did not cite this evidence anywhere in his decision. In making a credibility determination, the ALJ must "set forth on the record inconsistencies that lead to this

conclusion." Robinson v. Sullivan, 956 F.3d 836, 839 (8th Cir. 1992). The court will not speculate that the ALJ weighed this factor in his credibility assessment. See e.g., Gump v. Barnhart, 334 F.Supp.2d 1155, 1163 (E.D. Mo. 2004).

Some of the factors the ALJ considered are supported by the record and tend to undermine the credibility of Plaintiff's complaints, such as evidence that Plaintiff's depression was situational and that she failed to "establish[] care with a psychiatrist or psychologist." (Tr. 18). However, the court cannot find that the ALJ considered all of the relevant evidence, that the evidence the ALJ relied on so contradicts Plaintiff's subjective complaints that the ALJ could discount them, or that good reasons and substantial evidence support the credibility analysis. See Masterson, 363 F.3d at 738-39. Because the RFC assessment was based in significant part on a flawed credibility analysis and because it appears that the ALJ did not consider significant objective medical evidence that supports Plaintiff's complaints, the court finds that the RFC is not supported by substantial evidence on the record as a whole.

## VII. Conclusion

For the reasons set forth above, the court finds that the Commissioner's decision was not supported by substantial evidence. The Commissioner's decision is reversed and remanded for an appropriate analysis of Plaintiff's credibility and a reassessment of Plaintiff's RFC. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of March, 2016